Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Samuel Der-Yeghiayan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8256 | **DATE** | 12/16/2004 |
| **CASE TITLE** | International Typeface vs. Adobe Systems | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   For the reasons stated in the attached memorandum opinion, the plaintiff's and defendant's cross motions for summary judgment are denied in their entirety. Enter Memorandum Opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | DEC 17 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. Memorandum Opinion distributed by Judge's staff. | | docketing deputy initials | 87 |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| MW6 | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

INTERNATIONAL TYPEFACE )
CORPORATION, a New York )
corporation, )
 )
 Plaintiff, )
 )
v. ) No. 02 C 8256
 )
ADOBE SYSTEMS, INC., A Delaware )
corporation, )
 )
 Defendant. )

DOCKETED
DEC 17 2004

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Plaintiff International Typeface Corporation's ("ITC") motion for summary judgment and on Defendant Adobe Systems Incorporated's ("Adobe") motion for summary judgment. For the reasons stated below, we deny both motions in their entirety.

## BACKGROUND

ITC is engaged in the licensing of typeface designs and trademarks for use in connection with computer programs that, when used with appropriate hardware and software, produce human readable versions of typeface designs ("fonts"). In an

1

agreement effective February 26, 1991, Adobe was licensed by ITC to the rights to convert ITC typeface designs into font software using Adobe's PostScript computer language, and the non-exclusive right to reproduce and distribute such font software. The font software was to be distributed by Adobe through its website and other marketing outlets and by others under license from ITC. The agreement between the parties is mainly memorialized in three documents: 1) the "Restated and Amended Typeface License Agreement," effective February 26, 1991 ("1991 Agreement"), 2) the letter agreement dated April 22, 1993 ("1993 Letter Agreement"), and 3) the "Amendment Agreement" effective January 1, 1994 ("Amendment Agreement")(collectively referred to as the "Agreement").

In 1991 Adobe was working on a product, originally called "Carousel" but renamed "Acrobat," which solved the problem of creating electronic documents that would look the same to a recipient as to their creator. One way it solved the problem was by allowing fonts to be embedded, or included, in electronic documents. With embedded fonts, the recipient would see, and could print, an electronic document exactly as it had been written.

In order to remove any doubt that Adobe's rights concerning its typeface rights permitted Adobe to allow end users to embed the licensed fonts in electronic documents, Adobe obtained written agreement from several companies that supplied typefaces or fonts of their typefaces, among them Afga Corporation ("Afga"), Monotype Typography, Inc. ("Monotype"), ITC, and Linotype, which stated that "no

royalty shall accrue, and no license shall be required, for creation or distribution of, or grant of a license to create and distribute, whole or partial copies of Font Software which are saved in the file with the document for print and display purposes only." Adobe and ITC agreed to this amendment in the 1993 Letter Agreement.

In 1998 Agfa acquired Monotype, and subsequently Afga and Monotype merged to form Agfa Monotype Corporation ("AMT"). In early 2000, AMT acquired ITC, which by that time had no employees of its own, but, was instead entirely operated by AMT employees out of AMT offices. When AMT began informing Adobe End Users that they did not have the right to embed fonts of AMT typefaces in Adobe Acrobat documents that were intended to be distributed beyond the organization in which they were created, or for a fee, Adobe explicitly granted those rights to its End Users. In May of 2001, AMT notified Adobe that it was purportedly in breach of its agreement with Monotype and ITC.

On November 13, 2002, ITC filed a complaint against Adobe. Count I of the complaint seeks a declaration regarding ITC's ownership of the pertinent typefaces and font. Count II of the complaint alleges that Adobe breached the Agreement by licensing End Users to distribute electronic documents with embedded fonts of ITC typefaces in a manner inconsistent with the Agreement. In Count III, ITC alleges that Adobe breached the Agreement by distribution of Adobe Acrobat 5.0 with editable embedding technology.

## LEGAL STANDARD

Summary judgment is appropriate when the record reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)). In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case."*Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations or denials in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e) A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp,* 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986);*Insolia v. Phillip Morris, Inc.,* 216 F.3d 596, 599 (7th Cir. 2000). The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that

favor the non-moving party. *Anderson,* 477 U.S. at 255; *Bay v. Cassens Transport Co.,* 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

I. Ownership of the Intellectual Property

Both ITC and Adobe move for summary judgment on the issue of ownership over the Typefaces and font in question. ITC has presented this court with a variety of inconsistent positions in regards to Count I. In the complaint ITC first contends that it "is the exclusive owner of all rights in the Font Software for ITC Typefaces. . . ." (Compl. Par. 15). However, in ITC's answer to Adobe's original motion for summary judgment ITC argued that ITC and Adobe were joint owners of the intellectual property and that it was a "joint work." (1st Adobe Mot. Ans. 7). In ITC's subsequently filed motion for summary judgment, which is before us, ITC argues that it only partially owns the property and that ITC owns the digitized data within the Font Software and Adobe owns the copyrights in its PostScript font format. (ITC Mot. Mem. 12). In a subsequently filed answer to Adobe's current motion for summary judgment, ITC switches back to its joint ownership position, which is not consistent with the complaint, and argues in the alternative that the intellectual property at issue is a derivative work. (Adobe Mot. Ans. 4-6).

Adobe complains that it has been prejudiced because ITC has taken a variety of inconsistent positions. Adobe claims that ITC's lack of consistency in its positions has denied Adobe the opportunity to properly respond to ITC's positions and to conduct pertinent discovery to address all of ITC's arguments. The whole idea behind a summary judgment motion is to distill the material issues and material facts in order to allow the court to determine if judgment may be awarded as a matter of law. ITC's movement between inconsistent positions simply causes more confusion and prevents a clear resolution of the issues. Court proceedings should, from their beginning, be focused on resolving the pertinent issues. ITC, by changing its legal position throughout these proceedings, has inhibited an orderly and efficient progression of these proceedings. Only by piecing together ITC's various arguments in its briefs was the court able to re-construct what are ITC's apparent legal positions. The shift in positions by ITC has also made it difficult for Adobe to brief the pertinent issues for the court in a coherent fashion. Also, we granted the parties a page extension allowing briefs to exceed the fifteen page limitation, but not to exceed twenty-five pages in length for the summary judgment motions. However, ITC has not obeyed the court's explicit order. For example in ITC's reply brief on page seventeen ITC indicates that it will not state its argument in full in its reply brief and refers the court to another brief for additional arguments despite the fact that the reply brief utilizes the full twenty-five pages authorized by the court. Thus, ITC failed to comply with the court's order by attempting to circumvent the page

limitation ordered by the court. The fact that ITC has failed to present a clear position in regards to ownership and the fact that ITC failed to comply with this court's order regarding page limitations are sufficient in and of themselves for the court to deny ITC's motion for summary judgment.

### A. Exclusive Ownership Position

ITC's exclusive ownership position appears to be based on the language in the Agreement stating that "[a]ll ITC Typefaces will remain at all times the sole and exclusive property of ITC. . . ." (1991 Agr. Par. 4.1(D)). ITC claims that the understanding in the Agreement was that ITC would supply Adobe with digitized artwork, Adobe would generate Font Software from the digitized artwork, Adobe would distribute the Font Software to End Users, and Adobe would pay royalties to ITC for each distribution. Adobe points to language in the Agreement that grants Adobe the right to create Font Software. ITC responds that it was understood that the Agreement provided such right only to allow Adobe to create a product without ITC data and to allow Adobe to obtain ownership in certain limited instances. ITC argues that in the Agreement it reserved ownership in all products ultimately created from its digitized artwork.

### B. Derivative Work Position

ITC argues that Adobe's product was a derivative work that was based upon ITC's digitized artwork. Adobe argues that ITC merely provided Adobe with raw data that was utilized to begin the development process. Adobe argues that the final product is not merely a further refinement of the data provided by ITC and thus the Adobe product, created by its employees is solely owned by Adobe. Adobe also argues that the data provided by ITC has been altered and thus it technically is no longer present in the ultimate product and that ITC's claim that Adobe is using ITC data are false. ITC responds with its derivative work position arguing that it is not necessary that the identical data be present in Adobe's product for the Adobe product to be deemed a derivative work.

### C. Joint Ownership Position

ITC's joint ownership argument is that ITC provided Adobe with the raw digitized data and that Adobe used the data to create the ultimate product. ITC therefore concludes that it was a partner with Adobe in the creation of the final product. Adobe argues that its copyright cannot be transferred to ITC except in writing and that there is no evidence of such a writing. ITC responds with its joint ownership argument and states that, since ITC and Adobe were joint owners, ITC co-owned the copyright from the beginning and thus there was no need for a transfer from Adobe to ITC.

D. Partial Ownership Position

ITC's partial ownership argument is that Adobe owns the PostScript font format and ITC owns the "data that fixes or depict the particular licensed Typefaces" that it provided to Adobe. (ITC Mot. Mem. 12). ITC contends that in 1992 the Copyright office issued a regulation which permitted the registration of an entire outline font and that the date provided to Adobe falls within the scope of the regulation. Adobe vehemently objects to the partial ownership argument because it has never been raised by ITC until this point and Adobe was unable to conduct discovery regarding the feasibility of a partial ownership.

E. Genuinely Disputed Issues Regarding Ownership

There are genuinely disputed issues regarding ownership that precludes summary judgment in favor of either party on the ownership issue. We shall offer a few examples. The parties dispute the degree that the ITC digitized data was utilized to develop the Adobe product. ITC argues in its reply for its summary judgment motion that it disagrees with Adobe's assertion that "there is no evidence of ITC's contribution to the Font Software." (ITC Mot. Reply 2). While we agree that Adobe is not correct in its assertion that there is a complete absence of evidence regarding the subject, such evidence is far from conclusive in ITC's favor. In order to prevail on its motion, ITC is required to point to sufficient evidence that a reasonable trier of fact would be unable to find in favor of Adobe. ITC resorts to

speculation arguing that David Lemon ("Lemon") "who presumably worked with the Ikarus data would have been an excellent witness" and ITC argues that Lemon's "silence creates a presumption that ITC's claim that the Font Software was a joint work. . . ." (ITC Mot. Mem. 4).

We also note that the Agreement is not entirely clear in regards to ownership and the parties dispute what the understanding was between the parties regarding future ownership issues. For instance, Adobe argues that "[t]he testimony of ITC's President confirms that ITC understood" the distinction involved in giving Adobe ownership of the Font Software and that ITC's President understood "that Adobe, and not ITC, owned the copyrights in the Font Software." (Adobe Mot. Mem. 5). Adobe also points to a letter from ITC counsel to Adobe dated November 12, 2001, in which in one sentence ITC counsel makes reference to Adobe's ownership rights. However, neither the letter nor other evidence presented is dispositive for determining ITC's ownership interests. Adobe has not pointed to sufficient evidence that would allow the court to find in its favor as a matter of law on this issue.

Adobe has also taken inconsistent positions in regards to the ownership issue. Adobe has moved for summary judgment on the ownership issue and in certain instances contradicted its own position in its opposition to ITC's summary judgment motion. For instance, Adobe goes to great length in its answer to ITC's motion for summary judgment to point out all the unknown facts and disputed facts regarding ownership. Some examples are Adobe's assertion that it is not clear: 1) whether or

not ITC owns the pertinent digitized data, 2) the extent that the digitized data was used in the Font Software, or 3) if ITC even delivered the digitized data to Adobe. Adobe goes to great length in its motion for summary judgment to argue that there could not have been a transfer of its copyright to ITC, but Adobe fails to consider all of the disputed issues and facts raised by Adobe itself that relate to determining whether or not ITC was a full or partial owner of the product from the beginning. Despite Adobe's insistence that there are disputed facts regarding the ownership issue, and even its contention that further discovery may be necessary in order to proceed, Adobe argues on the other hand that it is entitled to judgment as a matter of law on the ownership issue because the facts are in its favor. We conclude that there are genuinely disputed issues in regards to ownership and therefore, we deny both parties' motions for summary judgment on Count I.

## II. Limitation on Scope of Distribution (Count II)

In Count II, ITC contends that Adobe breached the Agreement by distributing Font Software pursuant to an End User license agreement ("EULA") "which permitted End Users to embed Font Software into electronic documents for uses not allowed by the Agreement." (ITC Mot. 13). Adobe argues that ITC is collaterally estopped from arguing that Adobe violated the Agreement in this regard. Under the doctrine of collateral estoppel, the party seeking to invoke the doctrine must establish the following elements: "1) the issue sought to be precluded must be the

same as that involved in the prior action, 2) the issue must have been actually litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel is invoked must be fully represented in the prior action." *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 905-06 (7th Cir. 1990).

AMT and Adobe took part in an arbitration in London and in the arbitration the EULA that is at issue in Count II of this action was brought up by the parties. Adobe claims that AMT withdrew its scope of distribution claim on the third day of the arbitration hearings because of "the total failure of proof regarding its scope of distribution claim...." (ITC Mot. Ans. 15). Adobe claims that AMT withdrew the issue because it was likely to fail. (ITC Mot. Ans. 16). Adobe also claims that ITC is the wholly owned subsidiary of AMC and ITC's interests were represented at the arbitration.

ITC responds by claiming that in the arbitration "Adobe lost on its claim that it did not have to distribute under a EULA and on its claim that the 2001 EULA (*i.e.* the same EULA at issue here) fulfilled its obligation." (ITC Mot. Reply 16). Also, in yet another contradictory position, despite ITC's argument against the application of collateral estoppel in one instance, ITC points to the arbitration and the findings of the arbitrators in other instances, (ITC Mot. Mem. 18), and even attempts in its answer to Adobe's motion for summary judgment to argue that certain findings by the arbitrators are "binding upon Adobe under the doctrine of issue preclusion."

(Adobe Mot. Ans. 10). Although, ITC attempts to its contradictory positions in a footnote in its answer to Adobe's motion, its explanation is insufficient. Although collateral estoppel by its nature is addressed issue by issue, ITC's position is still in some respects inconsistent.

ITC also apparently seeks to explain its contradictory position in regards to collateral estoppel by arguing that, on one hand, the arbitration ruling "is binding upon Adobe under the doctrine of issue preclusion," (Adobe Mot. Ans. 10, 14 n.21), and then arguing later in the same brief that, in regards to the arbitration ruling's effect on ITC, "collateral estoppel does not apply." (Adobe Mot. Mem. 12). However, the Seventh Circuit has made amply clear, "collateral estoppel" and "issue preclusion" are synonymous terms and refer to the same doctrine. *See Stephan v. Rocky Mountain Chocolate Factory, Inc.*, 136 F.3d 1134, 1136 (7th Cir. 1998)(explaining that "the doctrine of issue preclusion" was "formerly known as collateral estoppel"); *See also In re Bridgestone /Firestone, Inc., Tires Products Liability Litigation*, 333 F.3d 763, 767 (7th Cir. 2003)(stating that "[a]lthough claim preclusion (res judicata) depends on a final judgment, issue preclusion (collateral estoppel) does not."); *Garcia v. Village of Mount Prospect*, 360 F.3d 630, 634 (7th Cir. 2004); *In re Catt*, 368 F.3d 789, 791 (7th Cir. 2004); *In re Hovis*, 356 F.3d 820, 822 (7th Cir. 2004); *U.S. Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 628 (7th Cir. 2003); *Brokaw v. Weaver*, 305 F.3d 660, 669 (7th Cir. 2002); *J & W Fence Supply Company, Inc. v. U.S.*, 230 F.3d 896, 898 (7th Cir. 2000); *Adair v. Sherman,*

230 F.3d 890, 893 (7th Cir. 2000); *Perry v. Sheahan*, 222 F.3d 309, 318 (7th Cir. 2000); *Freeman v. Page*, 208 F.3d 572, 575 (7th Cir. 2000); *Leavell v. Kieffer*, 189 F.3d 492, 496 (7th Cir. 1999); *Benson v. SI Handling Systems, Inc.*, 188 F.3d 780, 783 (7th Cir. 1999).

ITC also argues that the portions of the arbitrators' findings that Adobe focuses on were not necessary for their ultimate determination. ITC thus argues that the determination referenced by Adobe was not essential to the final judgment. We agree that the findings were not essential to the judgment. We also note that the arbitration was not conducted according to New York law. We also find that the record before us is not conclusive in regards to Adobe's contention that AMT withdrew the scope of distribution claim because it was going to fail in the arbitration. We cannot agree, based on the record before us, with Adobe's contentions that "AMT's abandonment of the scope of distribution claim was essential to the Arbitration Award" and that "there is no doubt that AMT withdrew its scope of distribution claim because it was likely to fail." (Adobe Mot. Mem. 10-11). Therefore, we find that ITC is not collaterally estopped from proceeding on Count II.

The parties dispute their understanding of how the scope of distribution was to be handled under the Agreement and the parties argue over the true meaning of testimony pertaining to the Agreement such as that of Ian Feinberg and Allan Haley. The parties argue as to the extent that Adobe was authorized under the Agreement to

14

distribute to End Users. The parties also dispute the issue of whether or not Adobe was required to distribute with a EULA. We cannot find in favor of either party on any of the distribution issues at this juncture and find that there are legitimately disputed issues that need to be resolved by the trier of fact. Therefore, we deny both parties' motions for summary judgment on Count II. Also, as noted above, we would deny ITC's motion for summary judgment regardless, due to its failure to comply with the court's page limitations.

III. Inclusion of Editable Embedding Technology in Acrobat 5.0

In Count III, ITC alleges that Adobe breached the Agreement by including in Acrobat 5.0 editable embedding features. ITC claims that in 1993 the Agreement was amended to allow Adobe to authorize End Users to embed copies of Font Software into electronic documents. However, ITC claims that it agreed to such an amendment only with the understanding that the embedding of the Font Software would be for print and display purposes. ITC contends that the embedding could not be used for the purpose of accessing the Font Software for the Typeface or editing the document. ITC claims that Adobe breached the limitations included in the 1993 amendment when it released Acrobat 5.0 which enabled End Users to embed Font Software for the purpose of viewing, printing and editing an electronic document. ITC also contends that the EULA utilized by Adobe in 2001 granted the End Users greater rights than Adobe was authorized to grant. We note that this is yet another

15

example of ITC's continual shift in its positions. Although ITC now contends that the EULA granted greater rights to End Users, in the complaint ITC contended that the EULA was "confusing and contradictory" and that it could "not adequately bind users" because it failed to clearly address the pertinent rights in regards to the Font Software. (Compl. Par. 43-46).

Adobe again raises the issue of collateral estoppel in regards to the Acrobat 5.0 issue because the arbitration addressed a similar agreement between AMT and Adobe. Adobe argues that ITC is bound by the arbitration ruling that "no term can be implied in the absence of an express obligation requiring that Adobe's direct distribution of fonts be under a EULA." (ITC Mot. Ans. 19). Adobe also disputes as to whether any ITC Typeface licensed by Adobe has been embedded in a form filed or annotation. Adobe also ties into the Acrobat 5.0 issue its position that it owned all of the product that it presented to End Users and thus it argues that it did not violate the Agreement with ITC.

Adobe argues that it should be granted summary judgment on Count III because the Agreement does not require Adobe to address the rights of End Users. Adobe argues that has no obligation to police End Users to ensure that they are not exceeding the authority provided by ITC. Adobe also argues that ITC is unable to prove that it suffered any damages as a result of the wrongdoing alleged in Count III. Adobe claims that for damages it is not enough to show that millions of copies of Acrobat 5.0 were provided to End Users. Adobe claims that ITC is required to show

that somewhere, some End Users actually improperly used an ITC font for embedding purposes. We note that the agreement at issue in the arbitration is not the same as in the present action and that the arbitration was not guided by New York law. We conclude that the issues presented in regards to Count III are not governed by collateral estoppel. We also conclude that there are genuinely disputed issues in regards to Count III and therefore deny both parties' motions for summary judgment on Count III. Also, as noted above, we would deny ITC's motion for summary judgment regardless, due to its failure to comply with the court's page limitations.

## CONCLUSION

Based on the foregoing analysis, we deny both parties' motions for summary judgment in their entirety.

Samuel Der-Yeghiayan
United States District Court Judge

Dated: December 16, 2004